# THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 23, 2024 Session

## TERRANCE REECE[1] v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 121854    Steven W. Sword, Judge**

———————————————

### No. E2023-00305-CCA-R3-PC

———————————————

The Petitioner, Terrance Reece, appeals from the Knox County Criminal Court's denial of post-conviction relief from his convictions for four counts of weapons violations, three counts of aggravated assault, and one count of vandalism and his effective twenty-two-year sentence. On appeal, the Petitioner contends that the post-conviction court erred by denying relief on his ineffective assistance of counsel claims and that he was prejudiced by the cumulative effect of counsel's multiple instances of deficient performance. We reverse the judgment of the post-conviction court and remand this case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Sherif Guindi, Knoxville, Tennessee, for the appellant, Terrance Reece.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] The record contains various spellings of the Petitioner's name. We use the spelling reflected in the indictment and in the pro se petition for post-conviction relief.

## OPINION

The Petitioner's convictions relate to an April 28, 2018 altercation involving the Solomon family. The facts of the case were summarized by this court in the Petitioner's previous appeal:.

> . . . [O]n the afternoon of April 28, 2018, the Defendant's estranged girlfriend, Jacqueline Solomon, who had recently moved out of the Oak Ridge apartment she shared with the Defendant, was transferring her belongings into a storage shed on her parents' Knoxville property when the angry Defendant came to the property, brandished a handgun, and threatened to kill Jacqueline,[2] Jacqueline's mother, Giselle Solomon, and Jacqueline's sister, Kallie Solomon. Mrs. Solomon pointed her own handgun at the Defendant and told him to leave, and he turned to go. Before departing, however, he kicked over the Solomons' mailbox and brandished his handgun at Jacqueline's father, Ronald Solomon, who was pulling up to the property as the Defendant was leaving. A short time later, the Defendant was arrested by an officer . . . , who found a .40 caliber bullet in the Defendant's pocket but no weapon on his person or in his vehicle. The Defendant was subsequently charged in a seventeen-count indictment with the aggravated assaults of Jacqueline, Giselle, Ronald, and Kallie Solomon, misdemeanor vandalism, four counts involving his possession of the gun after having been previously convicted of various felony offenses, and various counts under the gang-enhancement statute. The State, however, ultimately dismissed the gang enhancement counts of the indictment.

> . . . Michael Alan Mays of the Knox County Emergency Communications District 911, . . . identified the 911 calls made by Jacqueline Solomon about the incident, as well as the "CAD" or "computer-aided dispatch" log of those calls, all of which were admitted as exhibits . . . . According to his records, the first call was received at 1:57 p.m. on April 28, 2018, and the second call was received at 3:18 p.m. the same day. Mr. Mays was unable to find the record of a 911 call made from Mr. Solomon's cell phone.

---

[2] Because the victims in this case all share the same last name, we will at times refer to the younger members of the family by their first names only. We intend no disrespect in doing so.

-2-

Giselle Solomon testified that Ronald Solomon was her husband, and that her three children were thirty-year-old Jacqueline Solomon, her twenty-seven-year-old son, RJ Solomon, and her fourteen-year-old daughter, Kallie Solomon. The family residence was on Fay Street in Knox County, but she and her husband also owned a rental house on Joyce Avenue, located around the corner. The Defendant was Jacqueline's on-again, off-again live-in boyfriend, with the couple having shared an Oak Ridge apartment until approximately two weeks before the incident, when Jaqueline left with a few of her personal belongings and moved back into the family home on Fay Street.

Mrs. Solomon testified that on the day of the incident, the family went with Jacqueline and an Oak Ridge police escort to the apartment to retrieve the rest of Jaqueline's belongings. The Defendant was not at home, and the Oak Ridge police officers remained on the scene until they had packed up all the items and loaded them into their vehicles. The family then took the belongings to their unoccupied Joyce Avenue rental property to place them in the storage shed at the rear of the property. After Mr. Solomon and RJ had left, Mrs. Solomon and her two daughters were organizing the shed when they heard the Defendant approaching in his vehicle. Mrs. Solomon explained that it was the Defendant's habit to play his car radio at an excessively loud volume, which made it possible to hear him when he was still a block away. She said she had a handgun carry permit and regularly carried her own handgun with her. She stated that the Defendant had repeatedly threatened the family and earlier that day had driven past their Fay Street residence several times. Therefore, when she heard his approach, she told Jacqueline to hand her [the] gun, which was on a shelf of the storage shed. She also directed Jacqueline to call the police and Kallie to call Mr. Solomon.

Mrs. Solomon testified that the Defendant pulled up in a black Nissan Altima, stopped in the street just past their driveway, and got out of the vehicle screaming. The Defendant was carrying a black handgun and began walking down the drive to the carport. She began walking toward him, carrying her gun in her right hand down by her side as she repeatedly told him that the police had been called and he needed to leave the property. The Defendant raised his handgun, which she thought was a revolver, pointed it directly at her chest, and said, "All three of you f***ing b****es are about to die." The Defendant also pointed his gun at Jacqueline and Kallie, who had exited the shed, while repeatedly yelling that all three of them were about to die and, directed at Jacqueline, "B****, you're going to give me my s**t."

Mrs. Solomon testified that she raised her own gun, pointed it at the Defendant, and told him again to leave. She said she was confident that the Defendant would have killed Jaqueline if he had had the chance and that she was determined to die herself before she let him get close to her daughters. She said the Defendant turned to leave at about the same moment that her husband pulled up to the house. She screamed to her husband that the Defendant had a gun and watched as her husband exited his pickup truck with his gun in his hand. She saw the Defendant run to his vehicle, get inside, and take off down the street with her husband in pursuit in his truck. A short time later, she saw the Defendant passing their Fay Street residence in his vehicle with her husband following behind him in his truck. After her husband had returned home and the police had taken a report and left, she saw the Defendant drive past their home twice more. On one of those occasions, she saw someone else with the Defendant in his vehicle, as well as a second vehicle that contained four of the Defendant's friends.

When asked how she felt when the Defendant pointed his gun at her, Mrs. Solomon repeated that she thought her daughters were about to be killed and that she was prepared to die herself in order to protect her children. She said she had never before had a gun pointed at her or pointed her own gun at anyone. She stated that all three of them were crying, Jaqueline was also screaming, and Kallie was so traumatized that she later had to seek medical treatment for her anxiety. To the current day, Kallie expressed fear whenever she heard the sound of an approaching vehicle with a loud radio, always asking if it was the Defendant returning.

On cross-examination, Mrs. Solomon estimated that the police officers who responded remained at their home for approximately twenty minutes. She said they did not interview Kallie. She acknowledged that her husband had been violent in the past and that she had obtained an order of protection against him based on his having held a knife to her throat and beaten her. She said she had since had the order of protection set aside because she wanted Mr. Solomon's assistance in protecting their family from the Defendant. After a portion of one of Jacqueline's 911 calls was replayed, she acknowledged that Jacqueline told the 911 operator that the Defendant and Mr. Solomon were shooting at each other, which was not true. On redirect examination, she testified that the allegations she made against her husband were part of her divorce proceedings against him, which she had initiated after the events at issue in the case transpired.

Fourteen-year-old Kallie Solomon testified that on the day of the incident, the Defendant pointed a gun at her, her mother, and her sister and

said that all three of them were going to die, which scared her. She said she saw the Defendant again later that same day on two different occasions.

Ronald Solomon testified that in the two weeks before the incident, the Defendant repeatedly drove past their home and called ten to fifteen different times threatening to shoot up their house and to kill everyone inside. He said he attempted "to manipulate" the Defendant by being "nice to him" in order to get Jaqueline's belongings returned to her. The Defendant, who was not receptive, threatened to kill him, his wife, and his daughters, and to "have his boys do a drive-by" shooting. The Defendant also drove by their home several times on the morning of the incident.

Mr. Solomon testified that his wife called the police that morning to report the Defendant's behavior. The Defendant disappeared when officers arrived, and the Knoxville police officers remained at their home until the family departed for Oak Ridge. Oak Ridge police officers met them at the Oak Ridge apartment and remained with them while a locksmith opened the door and the family removed Jacqueline's property and loaded it in their vehicles. The family then drove to the Joyce Avenue property and unloaded the items at the storage shed. Mr. Solomon's son left, and the remaining family members began reorganizing the shed. Because they had not seen the Defendant since that morning and everything appeared to be calm, Mr. Solomon left to purchase tomato plants.

Mr. Solomon testified that he was returning from the store when he saw the Defendant's black Nissan stopped in the street in front of the Joyce Avenue house. He said he accelerated down the street and arrived to find the Defendant in the middle of the driveway jumping up and down and screaming with his gun pointed at Mrs. Solomon, Jacqueline and Kallie. He then saw the Defendant turn, run to the mailbox, and begin kicking the mailbox to the ground.

Mr. Solomon, who also had a handgun carry permit, testified that he pulled his truck up to block the Defendant's Nissan, grabbed his Glock 22 handgun, and opened the door to his truck. The Defendant saw him, ran to the other side of his truck, and managed to squeeze into the driver's seat of his Nissan and take off.

Mr. Solomon testified that he got back inside his truck and followed because he was tired of the Defendant's threats to his family and wanted him caught. He said the Defendant pointed his gun at him both before he got back inside his Nissan and as he was driving the vehicle from the scene. He

stated that the Defendant had a passenger with him in the vehicle, but it was the Defendant who pointed his gun out the driver's window behind him as Mr. Solomon followed him in his pickup truck.

Mr. Solomon described his vehicular pursuit of the Defendant and how the Defendant at one point turned his Nissan and began speeding toward Mr. Solomon's truck as if to ram it, but stopped, reversed, and fled again when Mr. Solomon "jumped out, and thr[e]w down on him." He also described the Defendant's attempts to elude him, the Defendant's driving past the Solomon residence with him still in pursuit, and his cell phone conversation with a 911 dispatcher, who kept telling him to stop following the Defendant. He stated that after he had relayed the Defendant's license plate number to the 911 dispatcher, he eventually went home to check on his family and to wait for the police. Shortly after the responding police [officers] had taken their report and left, the family again heard the sound of the Defendant's approaching car radio. Mr. Solomon testified that he stood in the carport with his gun at his side and watched as a black Dodge Charger with three men inside stopped at the curve of the street. The Defendant pulled up behind them in the Nissan, and the men in the Charger then slowly drove past their home with the laughing and giggling Defendant following behind in his vehicle.

Mr. Solomon estimated that it took approximately twenty-five to thirty minutes at the speed limit to reach Jacqueline's Oak Ridge apartment from his home. To his knowledge, the Defendant drove by the Solomon home only once after the police had completed their report and left. When asked how he felt when the Defendant pointed his gun at him, he said that he would not say that he was not scared, but his "main goal was [his] family and ending this ridiculousness[.]"

Mr. Solomon testified that during a court recess earlier that day, he was exiting the men's restroom when he saw the Defendant following Kallie and heard his wife scream, "He's following her." The next thing he knew, the Defendant had turned around and said to him, "F*** you. I'll kill you." He said that Kallie had been headed to the women's restroom, which was several feet beyond the men's, and that the Defendant had passed the men's restroom and was within five feet of Kallie when he saw him. He stated that another man, whom he knew casually from attending the same church in 2011, was present and overheard the Defendant's remark.

On cross-examination, he acknowledged that in his sworn statements in his divorce proceedings, he had accused his wife of fabricating allegations

-6-

against him and coaching their daughter, Kallie, on what to say. He said the Defendant's gun appeared to him to be a semi-automatic, smaller-caliber gun, similar to a .25. He acknowledged that his wife testified that she thought the gun was a revolver but said that his knowledge of guns was much more extensive than hers and that he could tell by its shape that the gun was not a revolver.

Officer Alexander Velez of the Oak Ridge Police Department testified that on April 28, 2018, he was searching for the Defendant and his vehicle, spotted him standing beside the vehicle on South Purdue Street, drew his weapon, and took the Defendant into custody. He said he found a .40 caliber bullet in the Defendant's pants pocket but did not find any weapons on the Defendant's person or in the vehicle. He testified that when he turned the Defendant over to the Knoxville Police Department, he asked if they wanted the bullet, and they told him they did not. He, therefore, disposed of the bullet. He estimated that it would take approximately twenty-five to thirty minutes at normal speeds to drive from West Knoxville to the location of the Defendant's arrest but agreed that the trip could be completed faster at higher speeds. He testified that the route between West Knoxville and the location of the Defendant's arrest passed over a bridge that spanned a small river.

On cross-examination, he testified that he arrested the Defendant at approximately 3:37 p.m. He acknowledged that he would have searched any obvious areas, including glove compartment, center console, seat pockets, and trunk, during his inventory search of the Defendant's vehicle.

James Harper of the Knox County Codes Administration and Fire Bureau, whose office was on the fifth floor of the courthouse building and whose testimony occurred on the day after Mr. Solomon's, testified that the previous afternoon he had just left the men's restroom when he saw Mr. Solomon, who had attended his church years earlier. He stated that he was chatting with Mr. Solomon when he noticed a man, later identified as the Defendant, trying to catch up with a young girl who was walking down the hall. As the Defendant passed, he heard him say, "I'm going to f'ing kill you." When he turned, he saw the girl go into the women's restroom and the Defendant start to enter after her. Concerned, he called, "Hey," and the Defendant stopped, came back, and entered the men's restroom. Mr. Solomon told him who the Defendant was, and Mr. Harper flagged down an officer to report the incident.

On cross-examination, Mr. Harper testified that he did not hear Mrs. Solomon scream. He said his attention was focused on the Defendant's approach to the women's restroom because it appeared that there was "a domestic issue occurring." He stated that the Defendant had his hand on the women's restroom door at the moment that he called "Hey" to stop him. He testified that the Solomons had attended his church for approximately two years, but, prior to the previous day, his last encounter with Mr. Solomon had been a casual greeting during a chance encounter approximately five years earlier.

. . . [C]ertified judgments of conviction against the Defendant . . . reflected the following prior felony convictions: a 2012 Knox County conviction for simple possession, casual exchange; a 2012 Knox County conviction for failure to appear; a 2013 Knox County conviction for simple possession, casual exchange; an April 20, 2001, Michigan conviction for attempted possession with intent to deliver cocaine; a September 21, 2001, Michigan conviction for larceny from a person; a July 25, 2002, Michigan conviction for breaking and entering a building with the intent to commit a larceny; and a June 14, 2004, Michigan conviction for "felony firearm."

Curtis Phillips, who lived directly across the street from the Joyce Avenue rental property, testified that he heard a commotion on the afternoon of April 28, 2018, looked out his living room window, and saw the daughter of the property owners engaged in a verbal altercation with the Defendant, who was inside a vehicle stopped on the street. He said the Defendant took off in his vehicle but returned almost immediately to resume the verbal altercation. He then saw the woman's father running down the driveway toward the Defendant. The Defendant sped off, followed by the father in his pickup truck. He never saw any of the parties with a weapon. On cross-examination, he acknowledged that he did not have a clear line of sight to the carport area.

Jacqueline Solomon testified that when she moved out of the apartment she shared with the Defendant, she took the Defendant's keys to his BMW, his identification, and his social security card. She said the Defendant called asking her to return them, but she refused. At approximately 1:00 p.m. on April 28, 2018, she was with her mother and sister in the back yard of the Joyce Avenue property when the Defendant pulled up to the property, got out, walked down the driveway, and began arguing with her about the return of his belongings. Mrs. Solomon saw the Defendant, pulled out her gun, and told Kallie to call Mr. Solomon. Mr. Solomon pulled up a short time later and got out of his truck with his gun

drawn. The Defendant kicked over the mailbox and then took off in his car with Mr. Solomon chasing him. According to Jacqueline, the Defendant was carrying a beer can when he first approached her in the driveway. She said he never had a gun.

Jacqueline testified that she called 911 and said that the Defendant had a gun because she feared that her father would hurt him and she thought the police response would be quicker if she said the Defendant was armed. She stated that in an earlier incident, Mr. Solomon had armed himself with an assault rifle to wait on the front porch of the family residence for the Defendant to drive by their home. She denied that the Defendant told her what to say or threatened her to testify on his behalf, and she insisted that her trial testimony was the truth.

On cross-examination, she denied that the reason she had moved out of the Oak Ridge apartment was because the Defendant had beaten her, and she agreed that she had been lying when she told the 911 operator that the Defendant had beaten her, that he had a gun, and that he had threatened to kill her, her mother, and her sister. She acknowledged that the Defendant had called her from the jail immediately following his arrest, as well as multiple additional times, in violation of a no contact order. She agreed that the Oak Ridge police had found a hidden compartment in her vehicle, which she had reported to the police as stolen by the Defendant. She conceded that she had testified under oath at the Defendant's bond hearing that she was a liar. Finally, she testified that she loved the Defendant and that her mother, sister, and father, who had never liked him, all lied during their testimony.

The Defendant testified that Jacqueline took his Social Security card, identification card, birth certificate, keys and title to his BMW vehicle when she moved out of their apartment. He said he made repeated calls seeking the return of his property and believed that he and Mr. Solomon had arranged for Jacqueline to return his items when she retrieved the rest of her belongings from their apartment. However, when he returned to the apartment on April 28, 2018, after she and her family had retrieved her belongings, he found that she had not left any of his items. Upset, he jumped in his borrowed Nissan and drove to Knoxville, where he saw Jacqueline and her mother in the back yard of the Joyce Avenue property. He said he threw his vehicle into park, got out, began walking down the driveway, and said to Jacqueline, "You got your s**t back. Now give me my s**t." Jacqueline began to approach him to talk, but her mother stopped her and told him to leave and that she was going to call the police.

The Defendant testified that he told Mrs. Solomon that she could call the police and that he wanted his stuff back. He said he kept walking down the driveway, but Mrs. Solomon and Jacqueline ran into the shed and shut the door, which angered him. He then threw down the can of lemon-lime margarita he had been carrying in his hand, turned, walked back to his vehicle, and got inside. As he sat there, he grew angrier as he thought about how they had tricked him, so he got out of his vehicle and began kicking over their mailbox. After his final kick, which toppled the mailbox, he felt something against his leg and looked up to see that Mr. Solomon had driven his pickup truck up against him and was holding a gun out the driver's window. At that point, he ran around the truck, got back in his vehicle, and took off.

The Defendant testified that Mr. Solomon chased him in his pickup truck for five to seven minutes. He said he initially circled back around to the Joyce Avenue house because he could not believe what was happening. He took off again, however, and eventually returned to Oak Ridge, where he was arrested. The Defendant acknowledged that he had driven past the Solomon residence earlier in the day and said it was to search for his missing BMW. He denied that he ever had a gun or that he ever attempted to ram Mr. Solomon's pickup truck. He testified that the bullet the Oak Ridge officer found in his pocket was not a functional bullet, but part of a piece of jewelry that belonged to the man who owned the Nissan. He claimed that the chain on which the bullet hung was in his pants pocket with the bullet, but the officer did not pull the chain out of his pocket during the search.

On cross-examination, the Defendant conceded his guilt of the felony convictions the State had admitted into evidence, with the exception of one Michigan drug conviction, which he claimed was a conviction by someone with the same first and last name whose record had been confused with his. He acknowledged that he did not call the police on the day of the incident to report that Mr. Solomon was following him with a gun. He further acknowledged that he had repeatedly violated the court's no contact order by calling Jacqueline every day that he was in jail following his arrest. He adamantly denied that he threatened Mr. Solomon in the hallway during the trial break, was following Kallie to the restroom, or attempted to enter the women's restroom.

On redirect examination, the Defendant testified that Jacqueline accepted his telephone calls from the jail, wrote him regular letters and emails while he was jailed, and initiated contact with him after his release from jail. He said he had pled guilty in each of his prior convictions, taking

-10-

accountability for his actions. He explained that his Michigan conviction for felon in possession of a firearm occurred when he was stopped by the police when he was en route to sell his gun to raise money to purchase a car seat for his new baby. On recross-examination, he acknowledged that at the time of that conviction, he had been under a court order not to own any firearms.

As his final proof, the Defendant introduced the courthouse surveillance video of the lobby and hallway areas outside the courtroom.

*State v. Terrance Reece*, No. E2020-01589-CCA-R3-CD, 2022 WL 484569, at *1-6 (Tenn. Crim. App. Feb. 17, 2022), *perm. app. denied* (Tenn. June 8, 2022). The Petitioner was convicted of the various weapons-related offenses, vandalism, and the aggravated assaults against Giselle, Jacqueline, and Kallie Solomon.[3] The jury acquitted the Petitioner of the aggravated assault against Ronald Solomon.[4] The Petitioner appealed his convictions, and this court denied relief. *Id*.

On June 12, 2022, the Petitioner filed a pro se petition for post-conviction relief, alleging multiple allegations of the ineffective assistance of counsel, double jeopardy violations in connection with his aggravated assault and weapon-related convictions, and prosecutorial misconduct. Relative to the ineffective assistance claim, the Petitioner asserted that trial counsel failed to cross-examine Kallie, failed to cross-examine adequately Mrs. Solomon about an alleged inconsistent statement regarding the named victims, failed to object to false and misleading testimony elicited by the State, failed to interview and present as a defense witness Knoxville Police Department (KPD) Officer Keith Lyon, and failed to object to his offender classification at sentencing. Although the Petitioner raised ineffective assistance allegations against appellate counsel, those allegations were abandoned at the post-conviction hearing. However, appellate counsel's testimony at the post-conviction hearing is relevant to the allegations of ineffective assistance of trial counsel.

On January 12, 2023, post-conviction counsel filed an amended petition for relief, alleging that trial counsel provided ineffective assistance by failing to cross-examine Kallie, by failing to cross-examine Mrs. Solomon regarding a prior inconsistent statement to KPD Officer Lyon about the named victims, failing to interview Officer Lyon as a potential defense witness, failing to investigate before deciding not to present KPD Officer

---

[3] The record contains various spellings of Jacqueline Solomon's first name. We use Jacqueline, which is the spelling contained in the indictment, for consistency.

[4] All of the victims in this case share the same last name. For clarity, we refer to Ronald and Giselle Solomon by Mr. and Mrs. Solomon, respectively, and to their daughters by their first names, Kallie and Jacqueline.

Bethany Leatherwood as a defense witness to establish that Jacqueline chose not to seek an order of protection against the Petitioner, failing to introduce properly Kallie's inconsistent statement, failing to introduce Jacqueline's letters and jail calls with the Petitioner in which she recanted her assault allegations, failing to introduce properly evidence of coaching allegations against Mrs. Solomon of Kallie during divorce proceedings, failing to object to the prosecutor's alleged vouching of Kallie's credibility during closing argument, failing to request the rule of sequestration of witnesses, failing to object at the sentencing hearing to the felony classifications and sentences imposed by the trial court, and failing to raise in the motion for a new trial issues related to vouching and sentencing. The Petitioner, likewise, alleged that the cumulative effect of counsel's multiple instances of deficient performance warranted relief. On January 17, 2023, the State responded, arguing that trial counsel provided effective assistance, that the State did not engage in prosecutorial misconduct, that the convictions did not violate principles of double jeopardy, and that the Petitioner failed to establish any prejudice.

At the January 20, 2023 post-conviction hearing, Kallie agreed that she testified at the trial that the Petitioner pointed a firearm at her, her parents, and her sister. She did not recall providing a police statement on April 28, 2018, which was the day of the incident, or speaking to Officer Lyon at the scene. Kallie denied previously telling her sister Jacqueline that when Kallie turned age eighteen, Kallie intended to "tell the truth" that the Petitioner "did not pull a gun on her."

The record reflects that Jacqueline was served with a subpoena to appear for testimony at the post-conviction hearing. Although she appeared, she left the courthouse before she was called to testify. The post-conviction court permitted the Petitioner to present an offer of proof regarding Jacqueline's anticipated testimony and reserved a determination of whether the court would require her to return for testimony or would "accept the proffer." Post-conviction counsel stated that he anticipated Jacqueline would impeach Kallie's post-conviction and trial testimony. Counsel stated that Jacqueline would testify that after the Petitioner's trial, Kallie stated that on her eighteenth birthday, she was going to "say the truth" that the Petitioner did not point a gun during the incident. Counsel stated that Jacqueline would also testify that Kallie "gave a different story as to what happened" before the Petitioner's trial. Counsel explained that at the trial, trial counsel attempted to question Jacqueline about Kallie's having "said something differently" to Jacqueline but that trial counsel was not permitted to ask Jacqueline questions about Kallie's previous inconsistent statement because trial counsel did not cross-examine Kallie and provide Kallie the opportunity to explain or to deny having made the statement.[5]

_____

[5] The record reflects that Jacqueline failed to appear at a subsequent hearing date to provide testimony, although she had likewise been subject to a subpoena.

-12-

KPD Officer Keith Lyon identified a crime incident report related to this case and testified that his report showed Mrs. Solomon, Jacqueline, and Mr. Solomon were the only individuals at the scene who alleged the Petitioner pointed a firearm on April 28, 2018. Officer Lyon agreed the report reflected that Mrs. Solomon reported the Petitioner stated, "You b------ are going to die." Officer Lyon agreed that the report did not mention Kallie or a juvenile victim.[6] Officer Lyon identified three warrants for aggravated assault and one warrant for vandalism. He said that the affiants were Mrs. Solomon, Jacqueline, and Mr. Solomon. Officer Lyon did not testify at the trial and did not recall if he testified before the grand jury, although he was listed on the indictment. He did not recall, because of the passage of time, whether trial counsel spoke to him about this case.

On cross-examination, Officer Lyon testified that although Kallie was not identified as a victim in his report, oftentimes additional information was learned later during an investigation. He noted that his report was a preliminary report.

KPD Officer Bethany Leatherwood testified that on May 2, 2019, she spoke by telephone to Jacqueline and that Jacqueline was "adamant she was not going to file for an order of protection" as a result of the incident in this case.

Appellate counsel testified that she became the Petitioner's attorney after trial counsel joined the District Attorney's Office. She was appointed on January 17, 2020, before the hearing on the motion for a new trial, and recalled that trial counsel provided her with the Petitioner's file just before court proceedings were paused due to the COVID-19 pandemic. Appellate counsel recalled that the incident report and affidavits of complaint identified Mrs. Solomon, Jacqueline, and Mr. Solomon as the only victims.

Appellate counsel testified that she reviewed the trial and sentencing transcripts before she filed an amended motion for a new trial and a renewed motion for a judgment of acquittal. Appellate counsel said the trial transcript reflected that trial counsel attempted to ask Jacqueline if Kallie had made a previous statement about the incident that had been inconsistent with Kallie's trial testimony. Appellate counsel recalled that the State objected to the question, that the trial court sustained the objection because trial counsel had not provided Kallie the opportunity to explain or to deny having made any prior inconsistent statement, and that trial counsel did not present Kallie as a defense witness or cross-examine her when she testified during the State's case-in-chief. Appellate counsel likewise recalled that Officers Lyon and Leatherwood were not defense witnesses. Appellate counsel stated that during closing argument, the prosecutor vouched for Kallie's credibility by stating, "You can take it to the bank," and that Kallie's credibility went unchallenged by the defense.

---

[6] Other evidence shows that Kallie was a juvenile at the time of the offenses and at the time of the trial. Kallie's eighteenth birthday was the date of her post-conviction testimony.

Appellate counsel identified a May 18, 2022 letter to the Petitioner and testified that she conveyed to the Petitioner her determination trial counsel "made some significant errors" before and during the trial and that the errors formed "a strong basis" for post-conviction relief. Appellate counsel said that she interviewed trial counsel and that afterward, she determined that in her opinion, trial counsel did not conduct a thorough investigation. Appellate counsel noted that although the defense had an investigator who conducted interviews, trial counsel "chose not to interview people."

Appellate counsel identified a September 28, 2020 letter, which included the Petitioner's proposed amended motion for a new trial. She agreed that the Petitioner's proposed motion included issues related to ineffective assistance of counsel and prosecutorial misconduct and that she did not include these two issues in her amended motion. She said that she did not include the ineffective assistance claim because the appeal from the conviction proceedings was not the correct "avenue." She said that in connection with prosecutorial misconduct, the Petitioner wanted to raise the issue of the prosecutor's vouching for Kallie's credibility but that it was not a strong issue for the motion for a new trial because trial counsel did not make a contemporaneous objection. Appellate counsel said that the Petitioner provided her with a previous proposed motion for a new trial in which the Petitioner wanted to raise a sentencing classification issue but that she did not think raising the issue "made sense."

Appellate counsel testified that "more pressing issues" were the focus of her amended motion for a new trial, which included Tennessee Rule of Evidence 404(b) testimony about an incident during a trial recess involving the Petitioner's threatening the victims. Appellate counsel said that, in her view, the prosecutor "knew what happened" but that trial counsel "had no idea." Appellate counsel said that trial counsel could have requested time to speak with the Petitioner, the Solomon family, and another unidentified witness, who worked in the courthouse, and that alternatively, trial counsel could have requested a short recess to investigate and interview the witnesses who were going to be called to testify at a jury-out hearing about the incident. Appellate counsel said that trial counsel could have also requested a "break for the day" in order for trial counsel to speak with "CCB to obtain the videos," which were not obtained until the end of the trial. Appellate counsel said that trial counsel "went into [the jury-out hearing] blind" and "completely unarmed to conduct cross-examination or challenge anything." Appellate counsel said that after she viewed the recording, she concluded that the recording "directly contradicted the testimony of two witnesses [at the jury-out hearing] in . . . important ways." She said that the two male witnesses[7] each testified that they did not speak about the incident but that the recording showed "they huddled outside – or by the DA's office door and spoke for several minutes with themselves and Kallie and Giselle Solomon."

[7] Other evidence shows that Mr. Solomon and James Harper testified at the jury-out hearing. Kallie and Mrs. Solomon did not testify.

-14-

Appellate counsel said that trial counsel's failure to obtain the recording at the time of the incident resulted in the witnesses' testimony going unchallenged and in the admission of extraneous evidence. Appellate counsel noted that each witness "mentioned" Kallie and Mrs. Solomon "being around" during the incident but that neither was presented as a witness. Appellate counsel said that the evidence about the Petitioner's threatening victims outside the restroom was not presented to the jury until trial counsel opened the door to admission of this evidence by questioning Mrs. Solomon about Mr. Solomon's reputation or character for violence.

Appellate counsel testified that trial counsel asked Mrs. Solomon about the allegations she made in her divorce proceedings that Mr. Solomon had a history of violence, that the State objected, and that a bench conference was held. Appellate counsel recalled that during the bench conference, it was "suggested" that evidence of Mr. Solomon's history of violence was irrelevant unless trial counsel pursued a theory of self-defense. Appellate counsel noted that trial counsel did not explicitly state that the defense theory was not self-defense but that trial counsel wanted the evidence before the jury. Appellate counsel said that in her opinion, Mr. Solomon's history of domestic violence was irrelevant to the incident in his case and noted that the evidence showed Mr. Solomon displayed a weapon first, which resulted in an acquittal for one count of aggravated assault in the indictment. Appellate counsel said that because trial counsel asked Mrs. Solomon about Mr. Solomon's history of violence, the trial court allowed the jury to hear evidence about the incident outside the courthouse restroom during a trial recess. Appellate counsel noted that during the bench conference, the trial court warned trial counsel that this line of questioning "would probably open the door to things" and that after eliciting the testimony, the court "confirmed that the door was open." Appellate counsel said that although trial counsel asked Mrs. Solomon about Mr. Solomon's history of violence, trial counsel did not ask Mrs. Solomon about allegations Mrs. Solomon had "coached" Kallie in the divorce proceedings. Appellate counsel said that as a result, trial counsel was precluded from questioning Mr. Solomon about his allegation that Mrs. Solomon had coached Kallie to "lie against him" during the divorce proceedings. Appellate counsel explained that if trial counsel had given Mrs. Solomon the opportunity to address Mr. Solomon's allegations, trial counsel would have been permitted to question Mr. Solomon about the allegations.[8]

Appellate counsel testified that self-defense was not the theory of the case because the Petitioner claimed that he possessed a beer can, not a firearm, and that he threw the can on the ground. Appellate counsel noted that the Solomons' neighbor, who witnessed the incident, testified that the Petitioner did not possess a firearm and said that it was "befuddling" to appellate counsel why trial counsel would consider a self-defense theory and present evidence of Mr. Solomon's alleged history of violence. Appellate counsel

---

[8] The trial transcript reflects that Mr. Solomon testified on cross-examination about his allegations against Mrs. Solomon in the divorce proceedings.

noted that a self-defense instruction was not provided to the jury and that trial counsel did not request the instruction.

On cross-examination, appellate counsel testified that she first spoke to the Petitioner at a court appearance and that her initial task was to file an amended motion for a new trial because the Petitioner believed he had been wrongfully convicted. Appellate counsel said that she obtained trial counsel's file, which included the audio recording of the preliminary hearing, the recordings of the 9-1-1 calls, the initial police report, the affidavits, the appointment orders, the pleadings, the discovery materials and responses, the letters from Jacqueline, trial counsel's notes, and the defense investigator's photographs. Appellate counsel did not recall if the defense investigator's reports were inside the file. Appellate counsel knew that trial counsel and the Petitioner met before the trial but did not recall if trial counsel's notes from these meetings were inside the file.

Appellate counsel testified that after meeting with the Petitioner and trial counsel, she obtained the trial transcripts, filed a motion for a copy of the courthouse video recording in connection with the Petitioner's threatening the victims outside a restroom during a trial recess, and filed the amended motion for a new trial. She stated that the Petitioner's version of the events outside the Solomon home was consistent each time they discussed the incident. She said that the Petitioner did not dispute he "kicked down their mailbox" but that the Petitioner maintained he was innocent of aggravated assault and unlawful possession of a firearm because he did not possess a firearm. She said that she focused on the incident outside the courthouse restroom because she thought those issues were "the most pervasive." She said that the incident during the trial recess was "poorly handled" by trial counsel, the prosecutor, and the trial court. Appellate counsel said that she also focused on the lack of challenges to witness credibility and highlighting inconsistencies between the witness testimony. She noted that trial counsel did not cross-examine Kallie and did not request the rule of sequestration, which resulted in all of the trial witnesses hearing all of the testimony.

An email exchange between appellate counsel, who at the time was preparing to file an amended motion for a new trial, and trial counsel was received as an exhibit. The exchange reflects, in relevant part, trial counsel stated that she learned after a recess about the Petitioner's threatening the victim and that although she raised a relevancy objection to evidence related to the threat, she did not raise any other objections because she understood the "rules to allow" the trial judge's questioning of witnesses. Trial counsel stated that she requested the video recording from the courthouse on the day of the incident but that a delay occurred because the District Attorney's Office had to provide "clearance" for the release. Trial counsel said the recording was released the following morning. Appellate and trial counsel agreed that the recording was played at a jury-out hearing before closing arguments and that a portion of the recording was played for the jury. Trial counsel recalled that the recording "showed an obvious commotion among the victims/witness, but didn't

show [the Petitioner] making a threat and of course it lacked audio." Trial counsel thought the recording "disputed their claim that he was closely stalking behind" Kallie.

In connection with questioning Mrs. Solomon about Mr. Solomon's character or reputation for violence, trial counsel stated in the email that she "strategically just wanted to get as much information in front of the jury to discredit [Mrs. Solomon] since she was the strongest witness" and that trial counsel did not "think the jury was likely to . . . trust [the Petitioner] anyway, so the negative hit to [Mrs. Solomon] was worth the potential negative hit" to the defense. Trial counsel, likewise, stated that the Petitioner "was in agreement with just taking the hit in order for the Jury to hear the divorce questions" and that the Petitioner's "opinion solidified what [trial counsel] already wanted to do, but [trial counsel] wanted to include him in case he had major concerns about it." Relative to the theory of the case, trial counsel stated that self-defense was not the theory, that she did not see "any aspect" of this case as self-defense because the Petitioner denied having a firearm, and that she did not request a self-defense jury instruction. Trial counsel stated that the trial court raised self-defense as the "basis for allowing [counsel] to question the Father[9] about his history of violence in his own family" and that the court said the evidence "wouldn't be admissible otherwise, so [counsel] kind of rolled with it to get the information in front of the jury." Trial counsel said, "Admitting even self-defense with a weapon would still have [the Petitioner] convicted of the felony weapons charges." Trial counsel stated that she did not speak to Officer Lyon or attempt to obtain the cruiser video recording from the scene. Trial counsel stated that she filed a motion to compel evidence of the bullet found in the Petitioner's pocket but that she assumed any existing video recording would have been provided in the discovery materials.

Trial counsel testified that after her December 11, 2018 appointment in this case, she received discovery from the Petitioner's previous attorney, discussed the case with the previous attorney, and spoke with the defense investigator, who provided his materials to her, hired by the previous attorney. She said that on April 1, 2019, she filed motions to compel discovery and inspection and to dismiss or suppress evidence pursuant to *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). She agreed that attached to her motion was the police incident report, which reflected that Mrs. Solomon told Officer Lyon that the Petitioner only pointed a gun at Mrs. Solomon and Jacqueline. When asked why she did not cross-examine Mrs. Solomon about this inconsistent statement, counsel said that she understood that Mrs. Solomon had not been thorough when speaking to the police, not that Mrs. Solomon had been inconsistent regarding at whom the Petitioner had pointed a firearm. Counsel said that she did not have a previous statement in which Mrs. Solomon had stated the Petitioner did not point a firearm at "the younger daughter."

---

[9] The trial transcript reflects that the trial court raised self-defense as a basis for questioning Mrs. Solomon about Mr. Solomon's reputation or character for violence.

-17-

Trial counsel testified that she did not interview Officer Lyon before the trial. She said that she spoke with the previous attorney's investigator Barry Rice, who had already "gone though all of the investigative work that seemed like it was necessary on the case." She said that she and Mr. Rice spoke about the witnesses he had interviewed or attempted to interview and that "there didn't seem to be anything to explore with [Officer Lyon] that I needed to do."

Trial counsel testified that she did not cross-examine Kallie for strategic or tactical reasons. Counsel said that she spoke with Jacqueline "many, many times pretrial" and that Kallie was a minor who had not provided a police statement. Counsel said she did not have any written materials with which she could question Kallie. Counsel said, though, that she attempted to learn through her conversations with Jacqueline what Kallie had previously said to Jacqueline. Counsel said she came to the conclusion that the "best strategy" was to attempt

> to get the jury to look at her -- to question her credibility really by attacking her parents and suggesting that they had influenced her to lie by bringing up the divorce proceedings, where the father had accused the mother of coaching [Kallie] to give false testimony against her father, and then to kind of create that idea in the minds of jurors, that if he's believing and swearing under oath that his wife has done this once before, it's certainly possible she's done that in this case, and to really cause the jurors to question that child witness by attacking adults, as opposed to a child.

Counsel stated that she also had concerns of alienating the jurors by "over strenuously" cross-examining a child and that not much was to be gained from cross-examining the child. She said that she had seen previous cross-examinations of children "go very, very wrong," that it was risky to cross-examine a witness when she did not know the anticipated responses, and that she did not think Kallie would admit on cross-examination to lying about whether the Petitioner possessed a firearm.

Trial counsel testified that she attempted to question Jacqueline about whether Kallie had made previous statements inconsistent with Kallie's trial testimony but that the prosecutor's objection was sustained. Counsel said that, based upon her interview, Jacqueline's anticipated testimony would have been that Jacqueline and Kallie had previously discussed this case, that Kallie had "made some indications" she never saw a gun, and that their parents "had encouraged [Kallie] to say there was a gun, when there wasn't." Counsel said that she informed Jacqueline that only one party needed to consent to being recorded during a conversation, that Jacqueline could record her conversations with Kallie in order to provide counsel with impeachment evidence, but that Jacqueline was unable to record their conversations. Counsel said that as a result of not having a written or recorded statement from Kallie, counsel attempted to present the evidence

-18-

through Jacqueline. When asked if counsel could have asked Kallie on cross-examination about any previous statements to Jacqueline in the absence of having a recorded statement, counsel said, " I might have gotten closer to it being admissible, but I think I would have still failed because there was no recorded statement to impeach her with." Counsel noted that Jacqueline informed counsel that Kallie was "never going against her parents' wishes; that no matter what [counsel] did or said, [Kallie] was going to be pretty steadfast because [Kallie's] going to want to please her parents." Counsel determined that "any questions along that line [were] going to generate a response that further solidifies [Kallie's] testimony for the jury." Counsel said that, based upon her investigation, she made a strategic decision not to question Kallie about any previous inconsistent statements made to Jacqueline. Counsel said that she did not attempt to interview Kallie before the trial by contacting Officer Leatherwood and that counsel did not have a strategic or tactical reason for not contacting Officer Leatherwood.

Trial counsel testified that she "vaguely" recalled the prosecutor's vouching for Kallie's credibility during closing argument. Counsel recalled the prosecutor's stating that Kallie's testimony was "unquestioned, and you can take that to the bank, something along those lines, something that I do agree comes close to vouching." Counsel said that she did not object because she believed that although "it came close," the prosecutor "maybe didn't cross the line" and that she did not want to draw further attention to the statement.

Trial counsel testified that she attempted to present evidence of Mr. Solomon's alleged history for violence in an effort to show a history of coaching Kallie. Counsel recalled that the Solomons' divorce proceedings showed that Mrs. Solomon had filed pleadings suggesting that Mr. Solomon had been violent with Mrs. Solomon or their children and that Mr. Solomon filed a sworn pleading in which he accused Mrs. Solomon of being a liar and of coaching Kallie into making a false statement. Counsel said that she wanted to "put [Mrs. Solomon] on the spot to either stand by those previous allegations against her husband . . . or to recant them." Counsel said that regardless of what Mrs. Solomon's response would have been, it would have impacted the State's witnesses' credibility, which would have benefited the defense. When asked why she did not present evidence of Mrs. Solomon's alleged coaching of Kallie through the testimony of Mr. Solomon in order to prevent admission of evidence of the incident during the trial recess, counsel said "there was some benefit to getting a response from her on those allegations." Counsel admitted, though, that any benefit was not worth the impact of the jury hearing evidence related to the Petitioner's alleged threatening the victims during a trial recess.

Trial counsel testified that although a video recording showed what transpired outside the courthouse restroom during the recess, she had not been able to view it before the trial court initially ruled that testimony about the incident was inadmissible. Counsel did not consider the recording critical evidence for the jury to view because the recording lacked audio and did not dispute or corroborate the allegations against the Petitioner.

-19-

Counsel said the recording merely showed that the Petitioner was in or near the area where the Solomons had been. Counsel agreed that the recording showed Mr. Solomon, Kallie, Mrs. Solomon, and the "old church buddy" huddling and speaking immediately after the incident. Counsel did not recall the witnesses testifying that they did not speak to each other immediately after the incident. Counsel said that she did not know requesting a delay in order to obtain the recording for the trial court's review "was an option available" to her.

Trial counsel testified that she did not know if she requested the rule of sequestration of witnesses. Counsel thought the victims' rights laws allowed the named victims, which included Mr. Solomon, Mrs. Solomon, Kallie, and Jacqueline, to be in the courtroom regardless of whether sequestration was requested. Counsel did not request any type of accommodation to exclude the victims from the courtroom while another victim testified.

Trial counsel testified that she researched the felony classifications of the conviction offenses and discussed the possible sentences with the Petitioner before the trial and the sentencing hearing. Counsel said that the Petitioner was sentenced as a career offender for the Class D and E felonies and as a persistent offender for the Class C felonies. When asked why she did not object to the prosecutor's stating at the sentencing hearing that the Petitioner's previous firearm conviction was a Class C felony, but was accurately a Class B felony, counsel said, "That would have just been a mistake on my part. . . . I can't say that there's some strategic reason why I did that."

On cross-examination, trial counsel testified that she had been licensed to practice law since 2012 and that her previous work involved criminal defense and personal injury. She said that before the Petitioner's case, she had worked on other aggravated assault cases and worked with defendants to prepare cases for a trial. Counsel said that after her appointment in this case, she spoke with the previous attorney and the defense investigator and met with the Petitioner several times at the jail. Counsel said that she met with Jacqueline many times, that Jacqueline indicated she was "disavowing [her] statement" in the 9-1-1 call, and that Jacqueline would testify that the Petitioner did not have a firearm and that "she had made that up at the time."

Trial counsel testified that she focused on the bullet found in the Petitioner's pocket on the day of the incident because such evidence could have been damaging to the defense when the Petitioner claimed he did not possess a firearm. Counsel said that she worked to exclude evidence about the bullet. Counsel said her focus was to establish that the Petitioner engaged in a verbal altercation with the Solomons but that he did not possess or display a firearm during the incident.

Trial counsel testified that she met with the defense investigator hired by the previous attorney and that the investigator interviewed witnesses and obtained defense proof for impeachment purposes. Counsel said that she interviewed Jacqueline and Curtis

Phillips, a neighbor who lived across the street from where the incident occurred. Counsel recalled that the neighbor saw some of the events and testified for the defense that he never saw a firearm in the Petitioner's possession.

At a subsequent evidentiary hearing, the post-conviction court explained that after considering the Petitioner's offer of proof regarding Jacqueline's anticipated post-conviction testimony, the court wanted Jacqueline to appear for testimony. Post-conviction counsel explained to the court that although Jacqueline had been served with a subpoena, she had not appeared at the courthouse. The parties and the court agreed that Jacqueline did not want to participate in the proceedings, and the court asked post-conviction counsel how he wanted to proceed. The Petitioner asked the court to take judicial notice of a video-recorded jail call between the Petitioner and Jacqueline. The State objected on the basis of relevance and argued the recording did not impeach Kallie's credibility. The court permitted the Petitioner to introduce the recording and stated that it would address in its order the extent to which the court would consider the recording.

The November 2022 video-recorded jail call between the Petitioner and Jacqueline reflected that they discussed matters unrelated to the case. Kallie entered the room with her dog. The Petitioner told Jacqueline to tell Kallie that he forgave Kallie, and Jacqueline said, "She's going to do what's right when she turns eighteen." Although Kallie did not respond to the Petitioner's and Jacqueline's statements, Kallie talked about the dog and Kallie's infant child. Jacqueline and the Petitioner continued to discuss matters unrelated to the case while Kallie remained in the room. Later during the conversation, but when Kallie was not present, Jacqueline explained that Kallie was waiting until she turned age eighteen to "do the right thing" because the father of Kallie's child was in the country unlawfully and that Kallie feared Mr. Solomon would have the child's father deported if Kallie "did the right thing" before Kallie turned age eighteen and married the father.

Upon this evidence, the post-conviction determined that the Petitioner failed to establish his ineffective assistance of counsel claims by clear and convincing evidence, save the erroneous felony classifications of three of the Petitioner's conviction offenses. The court found that trial counsel obtained the assistance of a defense investigator, obtained discovery, and met with the Petitioner multiple times to discuss the defense. The court found that counsel "developed a reasonable defense strategy" that the Petitioner engaged in a "verbal argument" with several members of the Solomon family but that the Petitioner did not possess a firearm. The court found that trial counsel presented two defense witnesses, a neighbor and Jacqueline, who testified that the Petitioner did not possess a firearm. The court found that Jacqueline was not a credible trial witness and noted that Jacqueline stated in the 9-1-1 call and told the police that the Petitioner possessed a firearm. The court found that although Jacqueline was subpoenaed to appear at the post-conviction hearing, she did not appear and did not testify.

-21-

The post-conviction court found that the video-recorded jail call between the Petitioner and Jacqueline occurred after the Petitioner's convictions. The court found that during the call, Kallie entered the room with a "puppy" and that Jacqueline stated, "She's going to do the right thing when she turns 18." The court found that the recording did not indicate that Kallie "heard this statement" and that "Kallie made no indication of adoption of such a statement." The court credited Kallie's post-conviction testimony that she never told Jacqueline that Kallie "would say that the defendant did not have a gun once she turned 18 and that the defendant did, in fact, threaten them with a gun." The court found, as well, that the recording was not inconsistent with Kallie's testimony and lacked any relevant statements from Kallie.

The post-conviction court found that trial counsel attempted to question Jacqueline at the trial about Kallie's stating previously that the Petitioner did not possess a firearm during the incident but that the trial court precluded counsel from asking questions because counsel failed to provide Kallie, the declarant, an opportunity to deny or to explain the statement. The post-conviction court found that counsel did not think Kallie's previous statement could be raised during Kallie's trial testimony because the statement was not recorded. The court found that counsel did not cross-examine Kallie because counsel did not want "to attack a child in front of the jury" and that counsel's strategy was to convince the jury Kallie "was just going along with what her parents wanted her to say." The court found that counsel did not impeach Mrs. Solomon with a previous statement regarding the identity of the victims because counsel did not conclude the statement was inconsistent with Mrs. Solomon's trial testimony. The court found that the defense investigator interviewed trial witnesses and that the defense did not interview Officer Lyon because the defense determined that the officer could not provide information not contained in the discovery.

The post-conviction court found that trial counsel's strategy was to show Mr. Solomon had a history of violence by presenting evidence that "not only that he was violent but had a history of coaching children in what to say in the past." The court found that counsel made a strategic decision that this information "was worth it even though it would open the door to the incident in the hallway during the trial that the court had previously ruled would be inadmissible."

The post-conviction court determined that the Petitioner failed to establish his ineffective assistance claim by clear and convincing evidence in connection with trial counsel's failure to conduct any cross-examination of Kallie. The court determined that Kallie's trial and post-conviction testimony were consistent and that Kallie denied telling Jacqueline that Kallie would tell the authorities at age eighteen that the Petitioner did not possess a firearm. The court determined that counsel's strategic decision not to cross-examine Kallie, a minor at the time of the trial, and to attack the credibility of Mr. and Mrs. Solomon was "a reasonable decision under the facts of this case." The court determined

that the Petitioner failed to present evidence showing that any additional information from Kallie would have benefited the defense at the trial.

The post-conviction court determined that the Petitioner failed to prove his ineffective assistance of counsel claim in connection with trial counsel's failure to cross-examine Mrs. Solomon about a prior inconsistent statement to Officer Lyon in which she did not identify Kallie as a victim. The court found that counsel was unaware of any inconsistency and that Officer Lyon testified that Mrs. Solomon never stated Kallie was not a victim. The court credited Officer Lyon's testimony that Kallie's name's not appearing in the initial police report did not mean Mrs. Solomon told the police Kallie was not a victim and that further information was often learned during the course of an investigation.

The post-conviction court determined that the Petitioner failed to prove his ineffective assistance of counsel claim in connection with trial counsel's failure to present Officer Leatherwood as a defense witness to establish that Jacqueline refused to obtain an order of protection against the Petitioner following the incident. The court determined that this evidence would not have provided any useful defense information because Jacqueline worked with trial counsel and testified for the defense.

The post-conviction court determined that the Petitioner failed to prove his ineffective assistance of counsel claim in connection with trial counsel's failure to request the witnesses be sequestered from the courtroom. The court found that although counsel testified that she did not have a strategic reason for not requesting sequestration, all of the witnesses were victims. The court determined that pursuant to "Tennessee Constitution Victim's Rights," the court would have allowed the Solomon family to remain in the courtroom.

The post-conviction court determined that the Petitioner failed to prove his ineffective assistance of counsel claim in connection with trial counsel's failure to object to the prosecutor's alleged improper vouching of Kallie's credibility during closing argument. After reviewing the trial transcript, the court determined that the prosecutor did not express his personal belief in Kallie's credibility. The court found that the prosecutor presented reasons the jury should credit Kallie's testimony.

However, the post-conviction court determined that trial counsel provided deficient performance by failing to cross-examine Kallie about any inconsistent statements Kallie made to Jacqueline that after Kallie turned age eighteen, Kallie "would say that the Petitioner did not have a gun." The court determined that counsel erroneously thought a prior inconsistent statement must be recorded or written as a prerequisite to admissibility and that counsel should have questioned Kallie about the prior statement on cross-examination. The court noted that if Kallie had denied at the trial that she made any prior

inconsistent statement, counsel would have been permitted to question Jacqueline about Kallie's prior statements for the purpose of impeaching Kallie's credibility. The court determined, though, that the Petitioner failed to establish prejudice because he failed to present any proof Kallie made an inconsistent statement, noting that at the post-conviction hearing, Kallie denied making any inconsistent statements regarding the Petitioner's possessing a firearm during the incident.

Further, the post-conviction court determined that trial counsel provided deficient performance by failing to argue that three of the Petitioner's weapon-related convictions were of a higher felony classification. The court found that at the sentencing hearing, the prosecutor erroneously stated that the offense date was before an amendment in the law which increased the felony classification of the conviction offenses in Counts 2, 3, and 4. The post-conviction court noted that in Count 2, unlawful possession of a weapon with having been previously convicted of a felony drug offense, the trial court imposed a twelve-year sentence as a career offender for a Class D felony with a release eligibility date of seven years, two months, and twelve days. In Counts 3 and 4, possession of a weapon while being a convicted felon, the trial court imposed twelve-year sentences as a Range III offender for Class C felonies with a release eligibility date of five years, four months, and twenty-four days. The post-conviction court noted that because Count 2 had the longest release eligibility date, the trial court merged Counts 3 and 4 into Count 2. The post-conviction court found, though, that under existing law at the time of the offenses, Count 2 was a Class C felony with a forty-five percent service requirement as a Range III offender and Counts 3 and 4 were Class B felonies with a thirty-five percent service requirement as a Range II offender.

The post-conviction court acknowledged that determining whether the Petitioner was prejudiced by trial counsel's deficient performance was "not an easy determination." The court stated that the remedy would be to increase the felony classification for each conviction. The court noted that it was "reasonable to assume that the court would have sentenced the Petitioner in Count 2 to twelve years at forty-five percent service because the court imposed twelve-year sentences in Counts 3 and 4, which would reduce the Petitioner's release eligibility date to five years, four months, and twenty-four days. The court was uncertain it would have imposed twelve-year sentences for the Class B felonies. The court stated that as a Range II, multiple offender, the sentencing range for a Class B felony was twelve to twenty years at thirty percent service, which would result in a release eligibility date of four years, two months, and twelve days for a twelve-year sentence and a release eligibility date of seven years for a twenty-year sentence. The court found that even if the Petitioner received the maximum sentence for a Class B felony, his release eligibility date would be reduced by two and one-half months. As a result, the court determined that the Petitioner had established prejudice and that he had proven his ineffective assistance claim by clear and convincing evidence. The court entered amended judgments for Counts 2, 3, and 4, reflecting the proper felony classifications and twelve-

year sentences for each conviction, which reduced the service requirement from sixty percent to forty percent. This appeal followed.

## I.      Ineffective Assistance of Counsel

The Petitioner contends that the post-conviction court erred by denying relief on his ineffective assistance of counsel claims in which the court denied relief.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2018). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice

prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## A. Cross-Examination of Kallie Solomon

The Petitioner argues that the post-conviction court erred by denying relief on his claim that trial counsel provided ineffective assistance by failing to conduct any cross-examination of Kallie Solomon. The Petitioner focuses on counsel's failure to question Kallie about whether Kallie told Jacqueline that the Petitioner did not have a firearm during the incident and that their parents encouraged Kallie to say the Petitioner possessed a firearm. The Petitioner asserts that counsel's misunderstanding of the rules of evidence resulted in prejudice. The State responds that the Petitioner failed to establish prejudice resulting from counsel's deficient performance.

The record reflects that at the trial, Kallie, who was age fourteen at the time of the trial, testified that the Petitioner pointed a firearm at her, Mrs. Solomon, and Jacqueline and that the Petitioner stated that all three women were going to die. The trial transcript also reflects that trial counsel did not cross-examine Kallie. At the post-conviction hearing, counsel explained that she did not cross-examine Kallie for strategic or tactical reasons and that her strategy was to lead the jurors to question Kallie's credibility by attacking the credibility of Mr. and Mrs. Solomon. Counsel wanted to show (1) that Mr. Solomon had accused Mrs. Solomon of coaching Kallie to provide false testimony against Mr. Solomon in their divorce proceedings and (2) that Mrs. Solomon coached Kallie to say the Petitioner possessed a firearm during the incident. Counsel also expressed concerns about "over strenuously" cross-examining a child and about Kallie's willingness to admit to lying about whether the Petitioner possessed a firearm. As the post-conviction court determined, this was "a reasonable decision under the facts of this case." Further, based upon trial counsel's decision not to cross-examine Kallie, counsel attempted to present evidence of Kallie's alleged inconsistent statement to Jacqueline that Kallie intended to tell the authorities at age eighteen that the Petitioner did not possess a firearm during the incident.

However, because trial counsel failed to question Kallie about any prior inconsistent statement Kallie might have made to Jacqueline about whether the Petitioner possessed a firearm, counsel was prohibited by the rules of evidence from questioning Jacqueline about Kallie's alleged prior inconsistent statement. *See* Tenn. R. Evid. 613(b). Counsel admitted at the post-conviction hearing that she thought a prior inconsistent statement was admissible only if the statement were written or recorded, which is not an accurate statement of the rules of evidence. *See id.* 613(a). Further, "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible *unless and until* the witness is afforded an opportunity to explain or deny the [statement]." *Id.* (emphasis added).

Although counsel made a strategic decision not to cross-examine Kallie, counsel's decision was based, at least in part, upon her erroneous conclusion that counsel could present extrinsic evidence of Kallie's alleged prior inconsistent statement through Jacqueline's testimony without first questioning Kallie about any inconsistent statement. Strategic, tactical decisions are only entitled to deference when based upon informed choices and adequate preparation. *See Adkins*, 911 S.W.2d at 347; *Cooper*, 847 S.W.2d at 528. Therefore, the record does not preponderate against the post-conviction court's determination that trial counsel provided deficient performance in this regard.

In any event, Kallie testified at the post-conviction hearing that she did not tell Jacqueline that when Kallie turned age eighteen, which other evidence shows was the date of her post-conviction testimony, she intended to "tell the truth" that the Petitioner "did not pull a gun on her." Kallie testified that the Petitioner pointed a firearm at her and her family. Kallie's testimony was consistent with respect to whether the Petitioner possessed a firearm. As a result, the record does not preponderate against the post-conviction court's determination that the Petitioner failed to establish counsel's deficient performance resulted in prejudice. The Petitioner is not entitled to relief on this basis.

## B. Evidence of the Incident Outside the Courtroom during a Trial Recess

The Petitioner argues that the post-conviction court erred by denying relief on his claim that trial counsel provided ineffective assistance by questioning Mrs. Solomon about her allegations in the divorce proceedings that Mr. Solomon had a history of violence because the trial court warned counsel that this line of questioning would open the door to the admission of evidence related to the Petitioner's threatening the victims outside the courtroom during a trial recess. The State responds that the Petitioner has waived this claim by failing to raise it in the original or amended petitions for relief.

Generally, appellate review is not afforded to issues not addressed by a post-conviction court, and plain error review is not available in post-conviction proceedings. *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020); *Lane v. State*, 316 S.W.3d 555, 561-62 (Tenn. 2010); *Walsh v. State*, 166 S.W.3d 641, 645-46 (Tenn. 2005); *Grindstaff v. State*, 297 S.W.3d 208, 219 (Tenn. 2009). However, a "Tennessee appellate court may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided without objection." *Holland*, 610 S.W.3d at 548. Although the issue was not specifically stated in the pro se or amended petitions for relief, the amended petition raised trial counsel's failure to introduce properly evidence of coaching allegations against Mrs. Solomon in the divorce proceedings. Further, a significant portion of the post-conviction evidence focused on counsel's decision to question Mrs. Solomon about Mr. Solomon's alleged history of violence after the trial court warned counsel that this line of questioning would likely open the door to the admission of evidence related to the incident outside a courthouse restroom during a trial

recess. In fact, counsel testified that her strategy for impeaching the State's witnesses' credibility was to attack the credibility of Mr. and Mrs. Solomon. Counsel wanted to establish that Mr. Solomon accused Mrs. Solomon of coaching Kallie to testify falsely against Mr. Solomon in the divorce proceedings and that Mrs. Solomon was coaching Kallie in the present case to state that the Petitioner possessed a firearm. The record reflects, as well, that the issue was litigated without objection from the State and that the post-conviction court ruled on the issue in its order. Therefore, the Petitioner has not waived appellate review of this issue. We will consider the issue on the merits.

The trial transcript reflects that during a jury-out hearing, the trial court stated that it had been informed by a court officer about an alleged incident which occurred during a previous recess. The court stated that "an officer overheard [the Petitioner] threaten one of the alleged victims in this case." Although the court officer was not questioned by the trial court, the court first questioned Mr. Solomon about the incident. Mr. Solomon stated that as he left the restroom, Kallie walked past him and that he saw the Petitioner, who "bucks up on me." Mr. Solomon said that the Petitioner did not "get in [his] face" but that the Petitioner stated, "F you. I'm going to freaking kill you." Mr. Solomon stated that Mrs. Solomon reported the Petitioner followed Kallie to the restroom, that the Petitioner did not enter the women's restroom, and that the Petitioner entered the men's restroom. Mr. Solomon thought a court officer heard the Petitioner's threat. Although the prosecutor questioned Mr. Solomon about the incident, trial counsel declined to question him.

The trial court, likewise, questioned James Harper about the incident. Mr. Harper, who worked for Knox County Codes Administration and Fire Bureau, was inside the courthouse at time of the incident and testified that he saw Mr. Solomon, whom Mr. Harper knew from church, and that they talked outside the men's restroom. Mr. Harper stated that Mr. Solomon's "young daughter" walked toward the restroom and that the Petitioner was "on her heels and . . . walking . . . right behind her . . . getting within close distance." Mr. Harper stated that Mr. Solomon's daughter passed them as she walked toward the women's restroom, that the Petitioner stated as the Petitioner walked by, "I'm going to F'ing kill you," that Mr. Harper thought the Petitioner was going to the women's restroom, that Mr. Harper stepped toward the women's restroom, and that the Petitioner entered the men's restroom. Upon questioning by trial counsel, Mr. Harper stated that he did not know to whom the Petitioner directed the statement.

Trial counsel objected to the admission of any evidence related to the incident outside the restroom on the basis that the evidence was not relevant to whether the Petitioner committed the alleged offenses in the indictment. The prosecutor argued that efforts to intimidate a witness were "highly relevant." After further consideration, the court found by clear and convincing evidence that the Petitioner "made this one statement." The court found that the threatening statement was material to the Petitioner's intent at the time of the offenses. The court noted the nature of the aggravated assault charges in which the

victims were alleged to have reasonably feared imminent bodily injury and found that a death threat was relevant. However, after weighing the danger of unfair prejudice, the court prohibited the State from eliciting evidence of the threat because the probative value did not substantially outweigh the danger of unfair prejudice. *See* Tenn. R. Evid. 404(b). The court stated, though, that it would revisit the issue should the proof warrant.

Mrs. Solomon was the prosecution's next witness when the trial resumed after the jury-out hearing. During cross-examination, trial counsel asked Mrs. Solomon if Mr. Solomon had "a reputation for being a violent man." The prosecutor objected, and a bench conference was held. The trial court asked counsel if she was attempting to introduce a self-defense argument, and counsel responded, "At least as to [Mr. Solomon]." The court stated that reputation evidence would be admissible to show Mr. Solomon was a primary aggressor if the Petitioner knew Mr. Solomon was aggressive. The court asked if counsel wanted to show that Mr. Solomon had a reputation for violence and that Mr. Solomon acted in conformity with this character trait. *See* Tenn. R. Evid. 404(a)(1), (2). Counsel replied, "Yeah." The court determined that this evidence was character evidence of an alleged victim and that the evidence would "likely . . . open the door for any character evidence toward [the Petitioner]." Counsel said she knew what she wanted to do but requested time to consult with the Petitioner in order for him to understand the implications if she continued with her line of questioning. After consulting with the Petitioner, counsel informed the court that she intended to continue her line of questioning, and the court clarified for the parties that the threatening incident outside the courthouse restroom would become admissible evidence against the Petitioner. *See id.* 404(a)(1), 404(b).

Trial counsel continued her cross-examination, during which Mrs. Solomon testified that Mr. Solomon had been violent "at times in his life," that Mr. Solomon had held a knife to her throat, and that he had threatened to "beat the hell out of [her] again." She stated that she obtained an order of protection against Mr. Solomon but that the order was set aside because she wanted his help protecting her family from the Petitioner.

After Mrs. Solomon's testimony, the trial court clarified, at the prosecution's request, its previous ruling in connection with the Petitioner's threatening Mr. Solomon outside the courthouse restroom. The court found that because the defense elicited evidence of Mr. Solomon's character as a violent person, the probative value of the Petitioner's threat increased. The court noted that Mr. Solomon's character for violence was only relevant to a self-defense theory, which was the court's reasoning for allowing the defense to present evidence of Mr. Solomon's character for violence.[10] The court determined that the Petitioner's threat was now relevant to motive, intent, and state of mind,

_____

[10] We note trial counsel's testimony at the post-conviction hearing that self-defense was not the theory of the case and that the defense theory was the Petitioner engaged in a verbal argument with the victims but did not possess a firearm.

"especially when we're talking about a potential self-defense argument." *See id.* 404(b). The court permitted the prosecutor to present evidence of the Petitioner's threatening Mr. Solomon outside the courthouse restroom.

The record reflects that Mr. Solomon testified on direct examination about the incident outside the courthouse restroom consistent with his testimony during the jury-out hearing. On cross-examination, Mr. Solomon testified that in his divorce proceedings, he accused Mrs. Solomon of fabricating allegations of violence against him and of coaching Kallie about what to say during the proceedings. After Mr. Solomon's testimony, Mr. Harper, likewise, testified about the incident outside the courthouse restroom consistent with his testimony during the jury-out hearing.

After the Petitioner testified for the defense, a jury-out hearing was held to determine the admissibility of the courthouse security video recording which captured at least a portion of the threatening incident outside the restroom. The recording was played for the trial court. Afterward, the court asked if the defense wanted to present the recording during its proof, and trial counsel asked that the recording "be entered." The recording was played for the jury, and the defense rested. The prosecutor argued during closing argument that the recording showed the Petitioner following Kallie, that the Petitioner "got so far as to put his hand on the women's restroom door until he was stopped by Mr. Harper," and that the Petitioner threatened to kill Mr. Solomon. The prosecutor requested that the jurors "bear that in mind when evaluating . . . [the Petitioner's] testimony." In counsel's closing argument, she briefly highlighted inconsistencies between the testimony of Mr. Solomon and Mr. Harper regarding the incident, but she did not argue the recording did not reflect that the Petitioner threatened anyone and did not corroborate the witness testimony that the Petitioner closely walked or stalked behind Kallie, as she noted in her email to appellate counsel.

At the post-conviction hearing, trial counsel testified that she attempted to present evidence of Mr. Solomon's alleged history of violence to establish Mrs. Solomon's history of coaching Kallie in judicial proceedings. Counsel's stated purpose for questioning Mrs. Solomon about Mr. Solomon's alleged violent behavior was to show that Mr. Solomon had accused Mrs. Solomon of being untruthful and of coaching Kallie to make a false statement. Counsel wanted to force Mrs. Solomon to stand by or to recant the allegations in the divorce proceedings in an effort to challenge Mrs. Solomon's credibility. Counsel thought a benefit existed to having Mrs. Solomon respond to "those allegations," but counsel conceded that any benefit was not worth the negative impact of evidence showing that the Petitioner threatened Mr. Solomon outside the courthouse restroom.

Trial counsel explained to appellate counsel that self-defense was not the theory of the case because the Petitioner denied possessing a firearm during the incident. Trial counsel noted that the trial court relied on self-defense as the basis for allowing her to

-30-

question Mrs. Solomon about her accusation that Mr. Solomon had a history of violence and that counsel "rolled with" the court's raising self-defense in order for counsel to present the jury with information about Mrs. Solomon's allegations against Mr. Solomon. Counsel said that claiming self-defense would have still resulted in the weapons-related convictions.

The post-conviction court determined that trial counsel made a strategic decision to present evidence of allegations that Mr. Solomon had a reputation or character for violence, foreclosing post-conviction relief. However, tactical, strategic decisions are only entitled to deference when based upon informed choices and adequate preparation. *See Adkins*, 911 S.W.2d at 347; *Cooper*, 847 S.W.2d at 528. The court found that counsel wanted to present evidence showing "not only that he was violent but had a history of coaching children in what to say in the past." However, the evidence preponderates against this determination. As reflected in her testimony at the post-conviction hearing, counsel's stated purpose of presenting this evidence was to discredit Mrs. Solomon and to show Mrs. Solomon had a history of making false allegations and of coaching Kallie's statements in the divorce proceedings. Counsel said she only "rolled" with the trial court's discussion about self-defense and character evidence in order to be able to question Mrs. Solomon about her allegations against Mr. Solomon. The theory was not self-defense but, rather, that the Petitioner did not possess a firearm during the incident.

The post-conviction court, likewise, determined that trial counsel made a strategic decision to question Mrs. Solomon about Mr. Solomon's history of violence on the basis that it "was worth it even though it would open the door to the incident in the hallway during the trial that the court had previously ruled would be inadmissible." Again, deference is only afforded to reasonable tactical decisions based upon informed choices and adequate preparation. *See Adkins*, 911 S.W.2d at 347; *Cooper*, 847 S.W.2d at 528. The record reflects that after Mrs. Solomon's trial testimony, a jury-out hearing was held to determine the admissibility of evidence related to counsel's cross-examination of Mr. Solomon. Counsel wanted to establish that Mr. Solomon had accused Mrs. Solomon of fabricating statements that he was violent and that Mrs. Solomon coached Kallie into making false statements during "judicial proceedings" in an effort to challenge Mrs. Solomon's and Kallie's credibility. Mr. Solomon acknowledged that he accused Mrs. Solomon of "telling [Kallie] what to say." Counsel explained to the trial court that the theory of admissibility was that the evidence was "key to witnesses' credibility and propensity to tell the truth that [Mrs. Solomon has] been accused by her husband in other judicial proceedings of not just lying, but lying about violence, making up acts of violence against him that he swears were not true." Counsel argued that Mr. Solomon had "accused [Mrs. Solomon] of coaching their daughter into what to say to gain an advantage in a judicial proceeding." Counsel argued that the jury "should be able to hear if there is a history that this child's been coached on what to say in judicial proceedings." The trial court, pursuant to Tennessee Rule of Evidence 608, determined that the evidence was relevant to Mrs. Solomon's truthfulness in connection with Mrs. Solomon's fabricating

"lies about [Mr. Solomon's] conduct" and about coaching Kallie. The court permitted counsel to question Mr. Solomon about his accusations against Mrs. Solomon but prohibited any extrinsic evidence. *See* Tenn. R. Evid. 608(a), (b). When the proof resumed, Mr. Solomon testified on cross-examination that, in his sworn statements in connection with the divorce proceedings, he accused Mrs. Solomon of fabricating false allegations that he was violent and of coaching Kallie "on what to say" in the divorce proceedings.

However, this court cannot fathom why trial counsel determined that questioning Mrs. Solomon about Mr. Solomon's reputation or character for violence was relevant to impeaching witness credibility. Mrs. Solomon's testimony in this regard was about character evidence for violence, not truthfulness and credibility. Counsel's purported goal was to present impeachment evidence of Mrs. Solomon, and to some extent impeachment evidence of Kallie, showing that Mr. Solomon alleged in the divorce proceedings that Mrs. Solomon falsely accused him of domestic violence and that Mrs. Solomon coached Kallie to make false statements about her father. Counsel's cross-examination of Mr. Solomon accomplished this goal, and the jury heard evidence related to Mrs. Solomon's and Kallie's truthfulness in this context. The issue is complicated by counsel's inconsistent positions at the trial and at the post-conviction hearing. At the trial, counsel acquiesced in the trial court's belief that the defense was asserting self-defense with regard to Mr. Solomon, and we note that self-defense was not mentioned at the trial beyond the jury-out hearing in connection with whether counsel could question Mrs. Solomon about Mr. Solomon's reputation or character for violence. However, at the post-conviction hearing, and in the email with appellate counsel, trial counsel testified that self-defense was not the theory of the case but that the theory was the Petitioner engaged in a verbal altercation with the Solomon family but did not possess a firearm. As a result, Mr. Solomon's character or reputation for violence was irrelevant to the defense and unnecessary to challenge Mrs. Solomon's and Kallie's credibility.

Trial counsel's failure to distinguish between impeachment evidence for truthfulness in Tennessee Rule of Evidence 608 and reputation or character evidence of a victim for violence pursuant to Tennessee Rule of Evidence 404 resulted in the admission of witness testimony that the Petitioner threatened to kill Mr. Solomon during a trial recess for the purpose of showing the Petitioner's motive, intent, continued hatred, and state of mind at the time of the offenses. *See id*. 404(a). There is nothing in the record to explain why counsel would expose the Petitioner to such damaging evidence in order to present irrelevant and unnecessary character or reputation evidence for violence when the defense theory was not self-defense and when the desired impeachment evidence related to Mrs. Solomon's and Kallie's credibility was elicited from Mr. Solomon. Without counsel's decision to raise Mr. Solomon's reputation or character for violence during Mrs. Solomon's testimony, the record reflects that the jury would not have heard evidence that the Petitioner threatened to kill Mr. Solomon during a trial recess. As the trial court concluded, the

probative value of the Petitioner's threatening Mr. Solomon increased, substantially outweighing the danger of unfair prejudice, after counsel elicited testimony from Mrs. Solomon about Mr. Solomon's reputation or character for violence. *See id.* 608, 404.

As a result, the record preponderates against the post-conviction court's determination that trial counsel made a reasonable strategic decision based upon informed choices and adequate preparation to present evidence related to Mr. Solomon's reputation for violence, knowing that the Petitioner's threat against Mr. Solomon during a trial recess would, as a result, be admissible evidence against the Petitioner. *See Adkins*, 911 S.W.2d at 347; *Cooper*, 847 S.W.2d at 528. Furthermore, absent the testimony about the Petitioner's threat, the majority of the convicting evidence focused upon the credibility of the witnesses, rendering credibility a critical issue in this case. Mr. Solomon, Mrs. Solomon, and Kallie testified that the Petitioner possessed a firearm. Jacqueline, Mr. Phillips, and the Petitioner testified that the Petitioner did not possess a firearm. Given the similarity in the substance of the Petitioner's threats during the offenses and during the trial recess, we conclude that the evidence preponderates against the post-conviction court's determination that the Petitioner failed to establish his ineffective assistance claim by clear and convincing evidence. The Petitioner established that counsel's deficient performance resulted in prejudice, and he is entitled to a new trial.

### C. Failure to Interview and Present Officer Keith Lyon as a Defense Witness

The Petitioner argues that the post-conviction court erred by denying relief on his claim that trial counsel provided ineffective assistance by failing to present evidence showing Officer Lyon's initial police report reflected that the only aggravated assault victims were Mr. Solomon, Mrs. Solomon, and Jacqueline. The Petitioner asserts that Officer Lyon's testimony would have impeached Mrs. Solomon's credibility regarding the incident. The State responds that the Petitioner failed to establish his claim by clear and convincing evidence.

The record reflects that trial counsel did not interview Officer Lyon before the trial and did not present him as a defense witness. Counsel, though, consulted with the Petitioner's previous attorney and the attorney's defense investigator, who had already "gone through all of the investigative work that seemed necessary on the case." Counsel concluded, after speaking with the investigator, that "there didn't seem to be anything to explore with [Officer Lyon] that I needed to do." Although Officer Lyon, the responding officer at the scene, completed an initial report which did not reflect Kallie was an aggravated assault victim, counsel understood that Mrs. Solomon had not been thorough when speaking to Officer Lyon about the identity of each victim. Counsel did not conclude that Mrs. Solomon had provided an inconsistent statement about whether Kallie had been a victim. Officer Lyon testified that although his initial report and arrest warrants did not reflect Kallie was an aggravated assault victim, oftentimes additional information was

learned during an investigation. Officer Lyon's report was merely a preliminary report of the offenses. The post-conviction court credited trial counsel's testimony in this regard, along with the testimony of Officer Lyon. We note that Mrs. Solomon did not testify at the post-conviction hearing regarding any alleged inconsistent statement, and as a result, the Petitioner failed to establish that Mrs. Solomon had been inconsistent. The record does not preponderate against the post-conviction court's determination that the Petitioner failed to establish his ineffective assistance claim by clear and convincing evidence. The Petitioner is not entitled to relief on this basis.

**D.      Failure to Object to Portions of the 9-1-1 Call**

The Petitioner argues that trial counsel provided ineffective assistance by failing to object to the portion of Jacqueline's 9-1-1 call in which she accused the Petitioner of vehicle theft, possession of drugs and firearms, and domestic abuse. The Petitioner asserts that the prior bad act evidence was inadmissible and prejudicial to the defense. The State responds that the Petitioner has waived appellate review of this issue by failing to raise the issue in the petition for relief and by failing to present any evidence related to the recording at the post-conviction hearing.

The issue related to the 9-1-1 call was not raised in the petitions for relief, was not litigated at the post-conviction hearing, and was not addressed by the post-conviction court. As a result, appellate review is waived. *See Holland*, 610 S.W.3d at 458; *Lane*, 316 S.W.3d at 561-62; *Walsh*, 166 S.W.3d at 645-46; *Grindstaff*, 297 S.W.3d 219. The Petitioner is not entitled to relief on this basis.

**II.      Cumulative Deficiencies of Performance**

The Petitioner argues that he is entitled to relief because he was prejudiced by the cumulative effect of trial counsel's multiple instances of deficient performance.

The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

"[W]hen an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice" of an ineffective assistance of counsel allegation. *Timothy Terell McKinney v.*

*State*, No. W2006-02132-CCA-R3-PD, 2010 WL 796939, at \*37 (Tenn. Crim. App. Mar. 9, 2010), *perm. app. denied* (Tenn. Aug. 25, 2010). More than one instance of deficient performance, when considered collectively, can result in a sufficient showing of prejudice pursuant to *Strickland*. *Id.* The question is whether counsel's deficiencies "cumulatively prejudiced . . . the right to a fair proceeding and undermined confidence in the outcome of the trial." *Id.* Counsel's failure to conduct adequate pretrial preparation and investigation may establish prejudice pursuant to *Strickland*. *Id.*

Because we have determined that the Petitioner is entitled to post-conviction relief in connection trial counsel's cross-examination of Mrs. Solomon, which resulted in the admission of evidence related to the Petitioner's threatening conduct during a trial recess, no additional relief is required. The Petitioner is not entitled to relief on this basis.

### III. Issues Raised in the Petitioner's Reply Brief

The Petitioner filed a reply brief, in part, to address the State's waiver argument in connection with the ineffective assistance claim related to trial counsel's opening the door to evidence related to the Petitioner's threatening witnesses during a trial recess. *See* T.R.A.P 27(c) . However, for the first time on appeal, the Petitioner contends in his reply brief that the indictment was void because the trial court lacked subject matter jurisdiction and that the court should have sentenced him as a multiple offender for the weapons-related and aggravated assault convictions. These issues were not raised in the petitions for relief, were not litigated at the post-conviction hearing, and were not addressed by the post-conviction court. As a result, appellate review is waived. *See Holland*, 610 S.W.3d at 458; *Lane*, 316 S.W.3d at 561-62; *Walsh*, 166 S.W.3d at 645-46; *Grindstaff*, 297 S.W.3d 219. The Petitioner is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is reversed. The case is remanded for a new trial.

_____
ROBERT H. MONTGOMERY, JR., JUDGE